FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 2 - 2022 ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DOMINICK J. SIANI,

                           Plaintiff,

       -against-

NASSAU COMMUNITY COLLEGE ("NCC");
MARIA P. CONZATTI, in her official capacity as
    Interim President of NCC;
DONNA M. HAUGEN, individually and in her
    official capacity as Officer-in-Charge of NCC;
JERRY A. KORNBLUTH, individually and in his
    official capacity as Acting Dean for
    Professional Studies of NCC;
JOHN DESPAGNA, individually and in his official
    capacity as Chair of the Accounting & Business
    Administration Department of NCC;
JERMAINE F. WILLIAMS, in his individual capacity;
JULIO W. IZQUIERDO, in his individual capacity; and/or
    the SUCCESSORS to the named parties in their
    official capacity,

                        Defendants.
-------------------------------------------------------------------X

CIVIL ACTION NO.:

CV 22 7077

COMPLAINT
JURY TRIAL DEMANDED

AZRACK, J.

LOCKE, M. J.

     The Plaintiff, Dominick J. Siani, *pro se*, as for his Complaint against the Defendants:

NASSAU COMMUNITY COLLEGE ("NCC"); MARIA P. CONZATTI, in her official capacity

as Interim President of NCC ("President Conzatti"); DONNA M. HAUGEN, individually and in

her official capacity as Officer-in-Charge of NCC ("Officer Haugen"); JERRY A.

KORNBLUTH, individually and in his official capacity as Acting Dean for Professional Studies

of NCC ("Dean Kornbluth"); JOHN DESPAGNA, individually and in his official capacity as

Professor and Chair of the Accounting & Business Administration Department of NCC ("Chair

DeSpagna"); JERMAINE F. WILLIAMS, individually as to his personal involvement in the

allegations herein as to the previous President of NCC ("Past President Williams"); JULIO W.

IZQUIERDO, individually as to his personal involvement in the allegations herein as the previous Vice President of Finance of NCC ("V.P. Izquierdo"); and/or the SUCCESSORS to the named parties in their official capacity, respectfully alleges as follows:

## NATURE OF ACTION

1.    This action is brought pursuant to 42 U.S.C. § 1983 (amended in 1979, Pub. L. 96-170, 1996, Pub. L. 104-317), to secure Plaintiff's equal protection rights under the Fourteenth Amendment of the United States Constitution, as to numerous acts of retaliation (including retaliatory hostile work environment), resulting from Plaintiff pursuing protected activities under multiple statutes involving claims of employment discrimination on various grounds.

2.    This action is also brought pursuant to 42 U.S.C. § 1981, (amended by the Civil Rights Act of 1991, Pub. L. No. 102-166), as to numerous acts of retaliation resulting from Plaintiff pursuing protected activities involving equal rights claims of racial discrimination under this statute.

3.    This action is also brought pursuant to Article 15, New York Human Rights Law ("NYHRL"), New York Exec. Law §§ 290 to 297, and the equal protection provisions of the Constitution of the State of New York, as to numerous acts of retaliation resulting from Plaintiff pursuing protected activities involving claims of discrimination under this statute.

## STATUTE OF LIMITATIONS

4.    This action is timely filed and each of the acts of retaliation alleged herein fall within the prescribed statute of limitations for the respective statutes, as follows: 42 U.S.C. § 1983 - three (3) years in New York State; 42 U.S.C. § 1981 - four (4) years; and NYHRL - three (3) years.

## JURISDICTION AND VENUE

5.    Jurisdiction is specifically conferred upon this U.S. District Court by 28 U.S.C. §§ 1331, 1343.  Jurisdiction is also conferred under 42 U.S.C. §§ 1981, 1983.

6.     Supplemental and pendent jurisdiction for state constitutional, statutory and common law claims are conferred upon this Court pursuant to 28 U.S.C. § 1367(a).

7.     The alleged acts of retaliation and deprivation of rights were committed within the jurisdiction of the U.S. District Court for the Eastern District of New York and venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (c).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.     Unlike claims and lawsuits brought under Title VII and the Age Discrimination in Employment Act (ADEA), actions brought under 42 U.S.C. §§ 1981, 1983 and NYHRL have no administrative prerequisite prior to filing suit.

## PARTIES

9.     Plaintiff, Dominick J. Siani, being a natural person and citizen of the United States, resides at 11 Walter Lane, Old Bethpage, Nassau County, Long Island, New York 11804, Telephone No.: (631) 265-4153.  Plaintiff's stated residence is also his legal mailing address.

10.     Defendant NCC is a community college, chartered and sponsored by the County of Nassau within the State of New York, and governed by a Board of Trustees appointed pursuant to § 6306 of the New York State Education Law.  NCC is located at One (1) Education Drive, Garden City, New York 11530.

11.     Defendant President Conzatti is named solely in her official capacity for the prospective and injunctive relief being sought and because she currently maintains overall administrative responsibility and oversight for NCC (since her appointment to the position on May 3, 2022).  Throughout this Complaint, wherever the term Defendant NCC is used it shall be deemed to include Defendant President Conzatti, in her official capacity.

12.     Defendant Officer Haugen is named in both her individual and official capacities, having maintained overall administrative responsibility and oversight for NCC during her

appointment to the position of Officer-in-Charge for the period from January 29, 2022 through May 2, 2022, and as to having personal involvement in specific allegations herein. All other times relevant to this action, Haugen served as NCC's General Legal Counsel.

13.     Defendant Dean Kornbluth is named in both his individual and official capacities, maintaining administrative responsibility and oversight for the Accounting & Business Administration Department of NCC through June 30, 2022, and as to having personal involvement in specific allegations herein.

14.     Defendant Chair DeSpagna is named in both his individual and official capacities, maintaining administrative responsibility and oversight for the Accounting & Business Administration Department of NCC and having personal involvement in specific allegations herein.

15.     Defendant Past President Williams, who resigned his position at NCC effective January 28, 2022, is named solely in his individual capacity as to personal involvement in specific allegations herein.

16.     Defendant V.P. Izquierdo, who resigned his position at NCC effective on or about April 30, 2022, is named solely in his individual capacity as to personal involvement in specific allegations herein.

17.     At all times relevant hereto, each of the individually named Defendants was acting under color of state law.

18.     At all times relevant hereto, each of the individually named Defendants was acting in their respective capacities as officers, agents and/or employees of Defendant NCC and within the scope of their employment.

19.     At all times relevant hereto, Defendant NCC has been in continuous operation at the location described above in ¶ 10 and has been subject to the provisions of 42 U.S.C. §§ 1981,

1983 and NYHRL.  Said location is also where the alleged retaliation and deprivation of secured Federal and New York State equal protection rights occurred.

## INTRODUCTION AND NATURE OF COMPLAINT

20.     Plaintiff's present employment relationship with NCC results from a stipulation of settlement resulting from previous litigation involving allegations of discrimination under multiple statutes.  After pursuing such protected activities, Plaintiff experienced multiple acts of retaliation in his present position, further contributing to a retaliatory hostile work environment.

21.     The acts of retaliation alleged herein were motivated by retaliatory animus exhibited by certain individually named defendants resulting from Plaintiff engaging in statutorily protected activities, including: a) filing a discrimination complaint internal to NCC; b) subsequently filing a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"); and c) seeking judicial relief by bringing a lawsuit in Federal court containing multiple counts of discrimination.

22.     The acts of retaliation alleged herein occurred immediately after Plaintiff assumed his current position, which is within the immediate temporal proximity of his pursuit of the aforementioned statutorily protected activities, thereby establishing a clear nexus between the protected activity and retaliation.

23.     The acts of retaliation alleged herein were persistent and extreme throughout the employment period and documented reports of such retaliation were not addressed by named individuals in key leadership positions, thereby perpetuating such illegal behavior (i.e., ongoing in nature).

24.     The discrete acts of retaliation are separately enumerated herein, along with numerous other acts of aberrant behavior that, when taken together, further substantiate claims that Plaintiff was subjected to a retaliatory hostile work environment.

25.     The allegations herein demonstrate that "but for" Plaintiff engaging in a host of protected activities, he would not have suffered the numerous materially adverse employment effects caused by Defendants' retaliatory animus.

26.     This action, brought pursuant to the aforementioned statutes, is to vindicate allegations of ongoing unlawful retaliation (including a retaliatory hostile work environment) and provide appropriate relief to Plaintiff, who was repeatedly subjected to such illegal behavior.

## PLAINTIFF'S STATUTORILY PROTECTED ACTIVITIES

27.     For the period from March 8, 2016 through December 19, 2019 (in excess of three years), Plaintiff tenaciously engaged in a host of protected activities in vindication of multiple counts of alleged discrimination with respect to NCC's hiring practices and procedures.

28.     On March 8, 2016, Plaintiff filed with NCC's Office of Equity, Inclusion and Affirmative Action (i.e., the responsible office), a formal Charge of Discrimination under the State University of New York ("SUNY") complaint procedure, alleging multiple counts of discrimination.

29.     On March 15, 2016, Plaintiff supplemented the SUNY Charge of Discrimination filed with NCC's Office of Equity, Inclusion and Affirmative Action.

30.     On April 21, 2016, due to a lack of timely investigation and processing of the SUNY Charge of Discrimination by NCC's Office of Equity, Inclusion and Affirmative Action (i.e., constructive denial of the charge), Plaintiff initiated the prescribed appeals process to NCC's president.

31.     On April 26, 2016, Plaintiff supplemented his appeal with NCC's president, which was subsequently denied on May 5, 2016.

32.     On May 24, 2016, Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Opportunity Commission ("EEOC") alleging multiple counts of discrimination.

33.     On April 1, 2017, after a lengthy delay by NCC in responding to Plaintiff's Charge of Discrimination, Plaintiff filed with the EEOC a rebuttal to NCC's position statement.

34.     On August 21, 2017, at the request of the EEOC, Plaintiff submitted conciliation options.

35.     On August 31, 2017, the EEOC issued a "Determination Notice", finding that NCC's defenses do not withstand scrutiny and there is reasonable cause to believe violations occurred and that NCC discriminated against Plaintiff on multiple bases, including age, sex and race.

36.     On October 15, 2017, at the request of the EEOC, Plaintiff submitted revised conciliation options.

37.     On March 26, 2018 (received on March 28), the EEOC issued to Plaintiff a "Notice Of Right To Sue (Conciliation Failure)", thereby providing for ninety (90) days to bring a private lawsuit.

38.     On June 6, 2018, Plaintiff timely filed suit in the U.S. District Court for the Eastern District of New York (18-CV- 3308), against NCC and multiple individuals as to various counts of discrimination under the ADEA, Title VII, 42 U.S.C. §§ 1981, 1983 and NYHRL.

39.     On April 17, 2019, Plaintiff filed an amended complaint in the aforementioned action, adding individually named parties and several causes of action.

40.     On October 8, 2019, the parties filed a Stipulation of Settlement in the aforementioned action (providing for monetary damages and future full-time employment for Plaintiff), which the Court so ordered on November 6, 2019.

41.     On December 19, 2019, the Stipulation of Settlement was fully consummated, having received all required approvals at NCC and upon the payment of the specified monetary damages to Plaintiff.

42.     On March 6, 2020, Plaintiff sent a certified letter to Defendant Past President Williams, detailing a host of issues supporting multiple retaliation claims alleged herein, further informing Williams that "a retaliatory hostile work environment [was] being perpetuated by certain known instigators."  This correspondence will be further detailed in the Statement of Facts, Allegations and Claims (*infra*).

43.     On February 8, 2022, Plaintiff sent a certified letter to Defendant Officer Haugen, detailing a host of issues supporting multiple retaliation claims alleged herein.  This correspondence will be further detailed in the Statement of Facts, Allegations and Claims (*infra*).

## STIPULATION OF SETTLEMENT - MAJOR PROVISIONS

44.     Relative to the previous litigation outlined above, the parties entered into a Stipulation of Settlement, General Releases and Order of Dismissal ("Stipulation"), filed with the Court for approval on October 8, 2019, which was so ordered on November 6, 2019.

45.     The Stipulation was contingent upon approvals by: NCC's Board of Trustees (approved October 15, 2019); the Nassau County Legislature (approved December 9, 2019) and NCC's insurance company (American International Group, Inc.).

46.     The Stipulation was further conditioned on the full payment of economic damages to Plaintiff from both NCC and its insurance company, which was completed on December 19, 2019.

47.     The Stipulation provided for monetary damages paid to Plaintiff totaling $210,000.00, consisting of $28,172.00 in back pay and $181,828.00 for emotional distress.

48.     The Stipulation further provided for ongoing employment for Plaintiff at NCC in the form of a full-time appointment to the position of Advisement Administrator (with a stipulated salary and benefits), retroactive to September 1, 2019 through August 31, 2023, after which Plaintiff would permanently and irrevocably sever his employment relationship with NCC.

49.     The Stipulation further provided for Plaintiff to resign his existing part-time position on the adjunct teaching faculty (effective at the end of the fall 2019 academic semester), with NCC obligated to pay all amounts owed to Plaintiff while on the adjunct faculty (including severance pay resulting from unused leave).

50.     Plaintiff's stipulated position of Advisement Administrator was assigned to the Accounting & Business Administration Department and responsible for providing academic advisement and course counseling for students pursuing degrees in the business disciplines; a position represented by Defendant NCC to satisfy a critical need to the college and the department (i.e., "a real job").

51.     Plaintiff's stipulated work schedule consisted of a four (4) day week, remaining in effect when classes were in session during the fall and spring academic semesters.

52.     Plaintiff's on-campus work location was to include suitable office space (in or around the assigned department), with access to office equipment consistent with the needs of the position.

**DEFENDANTS' KNOWLEDGE OF PLAINTIFF'S PROTECTED ACTIVITIES**

53.     Plaintiff alleges that each of the individually named defendants had knowledge of Plaintiff's protected activities prior to them engaging in a host of retaliatory actions, further contributing to a retaliatory hostile work environment.

54.     Plaintiff alleges that the general scope of his protected activities was widely known (i.e., common knowledge) within NCC's administration, the Accounting & Business Administration Department, the Adjunct Faculty Association and generally within the employee population.

55.     Plaintiff alleges that Defendant Officer Haugen (who also serves as NCC's general counsel), had firsthand knowledge of each and every protected activity since she

9

personally managed NCC's defense against Plaintiff's allegations of discrimination and retaliation across the entire spectrum of protected activities, along with securing the approval of the Stipulation by the Board of Trustees.

56.     Plaintiff alleges that Defendant Dean Kornbluth (a defendant in the previous lawsuit), had firsthand knowledge of each and every protected activity since he was the subject of many allegations and contributed to NCC's defense against Plaintiff's allegations of discrimination and retaliation across the spectrum of protected activities.

57.     Plaintiff alleges that Defendant Chair DeSpagna (a defendant in the previous lawsuit), had firsthand knowledge of each and every protected activity since he was the subject of many allegations and contributed to NCC's defense against Plaintiff's allegations of discrimination and retaliation across the spectrum of protected activities.

58.     Plaintiff alleges that Defendant Past President Williams had firsthand knowledge of the overall scope of Plaintiff's protected activities since he personally executed the Stipulation, which enumerated multiple causes of action against NCC, along with securing the approval of the Stipulation by the Board of Trustees.

59.     Plaintiff alleges that Defendant V.P. Izquierdo had firsthand knowledge of the overall scope of Plaintiff's protected activities since he was personally responsible for overseeing and implementing the financial aspects of the Stipulation, which enumerated multiple causes of action against NCC.

## STATEMENT OF FACTS, ALLEGATIONS AND CLAIMS

**Note:** *On March 10, 2020, NCC implemented an extended COVID-19 campus shutdown, transitioning academic and administrative functions to remote operations. The shutdown continued in large part for the spring 2020, fall 2020, spring 2021 and fall 2021 academic semesters. Due to these extraordinary circumstances and for proper context, the ensuing allegations are separated into three (3) distinct time periods, including: (1) pre-; (2) during; and (3) post-COVID-19 shutdown.*

## PRE-COVID-19 SHUTDOWN

60.     Under the terms of the Stipulation, Plaintiff essentially began his duties as Advisement Administrator on January 21, 2020, which was the start of the Spring 2020 semester.

61.     Plaintiff began his new responsibilities relieved that the prior legal dispute was resolved and hopeful that his new position of Advisement Administrator would represent a new beginning at Defendant NCC.

62.     Plaintiff alleges that the ensuing allegations of retaliation began immediately upon the commencement of his new position of Advisement Administrator, within the immediate temporal proximity (i.e., one month) after the prior lawsuit was settled, and the retaliation is of a continuing nature as demonstrated by the following incidents.

63.     Plaintiff alleges that, despite the passage of one (1) month from the conclusion of the previous lawsuit, the ensuing allegations of retaliation began at the very first opportunity possible (i.e., when Plaintiff began his full-time employment on January 21, 2020).

### Retaliation Incident No. 1: Office Debacle Resulting in Isolation
(Defendants NCC, Past President Williams, Dean Kornbluth and Chair DeSpagna)

64.     Plaintiff's assigned duties were part of the Accounting & Business Administration Department, which was physically located on the third floor of Cluster A.

65.     Cluster A was part of a massive complex containing classrooms and academic offices across four (4) connected clusters, including Clusters A through D.

66.     Plaintiff alleges that it is Defendant NCC's custom, policy and practice to locate personnel assigned to a particular academic department in the same location for purposes of staff collaboration and nexus with students enrolled in such programs.

67.     The Stipulation provided for Plaintiff to be located in or around the Accounting & Business Administration Department (referring to ¶ 52).

68.     Although Plaintiff was part of the Accounting & Business Administration Department, he was assigned an office in the Physical Sciences Department located on the third floor of Cluster D (D-3119).

69.     Plaintiff alleges that his assigned office location was inconsistent with NCC's custom, policy and practice of locating personnel assigned to a particular academic department in the same location.

70.     Plaintiff alleges that his assigned office location was inconsistent with what had been stated in the Stipulation.

71.     Plaintiff's office location was also far-removed from his assigned department, estimated to be nearly two (2) football field lengths away.

72.     Students requiring advisement services in the business disciplines (i.e., those students who Plaintiff was hired to advise), congregated in and around the Accounting & Business Administration Department offices located in Cluster A and not in Cluster D, where Plaintiff was remotely located.

73.     Plaintiff's remote office location was also inaccessible to the very students he was expected to advise since access to Cluster D was obstructed (restricted access) by construction in Cluster C, which was under total renovation (i.e., a veritable "hard hat" area, thereby isolating Cluster D from Clusters A and B).

74.     Plaintiff's remote office location also isolated him from his co-workers within the Accounting & Business Administration Department, thereby impeding the development of any collaborative working relationships within the department.

75.     Plaintiff's remote office location in the Physical Sciences Department (i.e., Astronomy, Climatology, Geology, etc.), was further isolating since he had no common background or purpose in interacting with employees or students studying the physical sciences in Cluster D.

76.     Plaintiff alleges that the outward reaction to his office location by employees in the Physical Sciences Department (some who knew of Plaintiff's previous litigation), was entirely perplexing, viewing Plaintiff as an outcaste from the Accounting & Business Administration Department and an intruder of which to be leery.

77.     Plaintiff's subjective reaction regarding his office location in Cluster D was that he was being intentionally isolated due to his pursuit of a host of protected activities, including the prior lawsuit.

78.     Plaintiff also believed that he had been placed in solitary confinement in Cluster D as punishment for having sued Defendant NCC and several individually named parties.

79.     Plaintiff alleges that Defendants Dean Kornbluth and Chair DeSpagna were directly responsible for establishing Plaintiff's remote office location, in contravention to the customs, policies and practices of Defendant NCC and the Stipulation (referring to ¶¶ 66-67 and 69 [*all paragraph references are inclusive*]).

80.     Both Defendants Dean Kornbluth and Chair DeSpagna were named parties (officially and individually) in the prior lawsuit, alleging that they each discriminated and retaliated against Plaintiff involving multiple claims.

81.     Plaintiff realleges that Defendants Dean Kornbluth and Chair DeSpagna had full knowledge of his statutorily protected activities (referring to ¶¶ 56-57).

82.     Plaintiff alleges that both Defendants Dean Kornbluth and Chair DeSpagna exacted their campaign of retaliation at the very first opportunity they had (i.e., when Plaintiff began his new full-time position with Defendant NCC).

83.     Plaintiff alleges, that despite having adequate office space in his assigned department located in Cluster A (i.e., office A-3000), Defendants Dean Kornbluth and Chair DeSpagna arranged for Plaintiff's office location to be as remote and inaccessible as possible.

84.     Plaintiff alleges within the temporal proximity of becoming aware that Plaintiff's prior lawsuit was settled with NCC (and that he would be joining the Accounting & Business Administration Department), Defendants Dean Kornbluth and Chair DeSpagna put a sign on an empty office in Cluster A (A-3000), indicating it was occupied by the "Dean of Professional Studies") (i.e., Kornbluth's very title).

85.     Despite the placement of a sign that he occupied office A-3000, it was common knowledge that Defendant Dean Kornbluth's office location was in a separate building at 361 Rice Circle, where all the Deans are located.

86.     Plaintiff alleges that Defendants Dean Kornbluth and Chair DeSpagna placed the aforesaid sign on office A-3000 to give the false impression that such office was occupied and unavailable for Plaintiff's use.

87.     Plaintiff alleges that Defendants Dean Kornbluth and Chair DeSpagna actions to isolate Plaintiff from his assigned department were entirely motivated by retaliatory animus since, for all intents and purposes, Plaintiff should have been located in Cluster A (as was the custom, policy and practice of Defendant NCC).

88.     In line with his duties and during a workday occurring on or about February 6, 2020, Plaintiff was actively seeking to find students in need of assistance when he entered Cluster A and encountered Defendant Chair DeSpagna, who immediately demanded that Plaintiff return to his office in Cluster D and refrain from entering Cluster A in the future.

89.     Plaintiff complied with Defendant Chair DeSpagna's demand, sensing that any resistance may likely result in DeSpagna escalating the matter into a verbal altercation.

90.     Plaintiff's subjective reaction to Defendant Chair DeSpagna's demand was one of disbelief since Plaintiff was hired to assist business students who congregate in and around Cluster A.

91.     Plaintiff found Defendant Chair DeSpagna's demand and demeanor to be hostile and antagonistic since he should have been pleased that Plaintiff was taking the initiative to seek out business students in need of assistance.

92.     Plaintiff's subjective reaction to Defendant Chair DeSpagna's demeaner was that it had been motivated by a deep-seeded retaliatory animus prompted by Plaintiff's host of protected activities, further noting that it was apparent that DeSpagna could not tolerate Plaintiff's presence anywhere within his sphere of influence.

93.     From the point of the encounter with Defendant Chair DeSpagna on February 6, 2020, Plaintiff fully understood that he was not welcome within the very department he was hired to serve.

94.     After the encounter with Defendant Chair DeSpagna, Plaintiff also believed that his office placement, outside the department in Cluster D, was an intentional act of retaliation and harassment.

95.     Due to Plaintiff's belief that he was being subjected to retaliatory behavior, he wrote a detailed letter (via U.S. Certified Mail) dated March 6, 2020, to Defendant Past President Williams, detailing a host of issues requiring remedial action.

96.     With respect to this incident involving the office debacle, Plaintiff wrote in the certified letter of March 6, 2020, the following:

> "The Agreement stipulates that Plaintiff shall be provided with suitable office space in or around the Accounting and Business Administration Department.  However, my office location is in the Physical Sciences Department in Cluster D (D-3119), which is far-removed from my assigned department located in Cluster A.  In order for a student to find me, they would need to travel nearly two (2) football field lengths, while traversing the construction occurring in Cluster C, which is under total renovation.  Moreover, assigning me to Cluster D, while there is an available office in Cluster A (A-3000), is entirely unreasonable.  Locating me in Cluster D completely isolates me from my assigned department and impedes the ability to interact with the very students the College has represented are in need of advisement services."

97.     With respect to this incident and concerns over acts of ongoing retaliation, Plaintiff also wrote in the certified letter of March 6, 2020, the following:

> "The College should also be mindful that several of the issues outlined above parallel allegations in the litigation underlying this Agreement relative to establishing a retaliatory hostile work environment, which is being perpetuated by certain known instigators."

98.     Plaintiff realleges that Defendant Past President Williams had full knowledge of his statutorily protected activities (referring to ¶ 58).

99.     Plaintiff alleges that Defendant Past President Williams did not respond to the letter and neither he nor anyone else at Defendant NCC took steps to address the incident, thereby allowing the retaliation to continue unabated.

100.    Plaintiff alleges that this incident was materially adverse in nature to his employment at Defendant NCC and constitutes a discrete act of retaliation.

101.    Plaintiff further alleges that this incident was sufficiently severe to negatively affect the conditions of his employment and contributed to an abusive and retaliatory hostile work environment.

102.    Plaintiff further alleges that, but for him engaging in a host of statutorily protected activities (referring to ¶¶ 27-43), he would not have suffered the materially adverse employment effects related to this incident.

### Retaliation Incident No. 2: Marginalization from Assigned Duties
(Defendants NCC, Past President Williams, Dean Kornbluth and Chair DeSpagna)

103.    Student advisement needs at Defendant NCC peek at the start of an academic semester, which was coincident with Plaintiff's first day of work on January 21, 2020.

104.    Relative to his duties and for the period from January 21, 2020 through March 9 2020 (all pre-COVID 19 shutdown), Plaintiff did not provide any advisement services, whatsoever.

105.   For the stated period, not a single student was referred to Plaintiff (from his assigned department or otherwise), nor did a single student seek him out in Cluster D.

106.   For the stated period of approximately thirty-five (35) workdays (i.e., 236 work hours), Plaintiff was ready, willing and able to provide advisement services to students, but instead sat idle in his office in Cluster D.

107.   Plaintiff's subjective reaction regarding these circumstances was that he had been totally isolated and intentionally marginalized due to his pursuit of a host of protected activities, including the prior lawsuit.

108.   Plaintiff felt as if he had been marginalized as punishment for having sued Defendant NCC and several individually named parties.

109.   Plaintiff's expectation, that he would be performing a meaningful service to NCC (and its students), was entirely dashed when he sat idle for such an extended period of time.

110.   Plaintiff found these circumstances to be extremely frustrating, disheartening and debilitating since sitting idle is anathema to Plaintiff's work ethic.

111.   Plaintiff alleges that Defendants Dean Kornbluth and Chair DeSpagna were responsible for the lack of student advisement referrals and the inability for students to seek out Plaintiff's assistance.

112.   Plaintiff realleges that Defendants Dean Kornbluth and Chair DeSpagna had full knowledge of Plaintiff's statutorily protected activities (referring to ¶¶ 56-57).

113.   Plaintiff realleges that both Defendants Dean Kornbluth and Chair DeSpagna exacted their campaign of retaliation at the very first opportunity they had (i.e., when Plaintiff began his new full-time position with Defendant NCC).

114.   Plaintiff further alleges that the retaliatory animus exhibited by Defendants Dean Kornbluth and Chair DeSpagna knows no bounds since their marginalization of Plaintiff was harmful to all stakeholders (including students, faculty, NCC and especially Plaintiff).

115.     Due to Plaintiff's belief that he was being subjected to retaliatory behavior, he wrote a detailed letter (referring to ¶ 95) to Defendant Past President Williams, detailing a host of issues requiring remedial action.

116.     With respect to this incident involving his marginalization and the lack of student referrals, Plaintiff wrote in the certified letter of March 6, 2020 (in relevant part), the following:

> "The Agreement stipulates that Plaintiff's duties and responsibilities are confined to the administration and advisement of students in the academic areas for which he is suitably qualified.  Relative to these duties, since the inception of the spring semester on January 21, 2020 through the date of this letter, not a single student has been referred to me for advisement [...]"

> "[...] To be clear, I have no intention of being marginalized in such a questionable role for the duration of the Agreement and there can be no reasonable justification for the County to sustain the financial burden of such a position as it is presently structured."

117.     Plaintiff realleges that Defendant Past President Williams had full knowledge of his statutorily protected activities (referring to ¶ 58).

118.     Plaintiff realleges that Defendant Past President Williams did not respond to the letter and neither he nor anyone else at Defendant NCC took steps to address the incident, thereby allowing the retaliation to continue unabated.

119.     Plaintiff repeats and realleges the allegations set forth in ¶¶ 100-102, with the same force and effect as if set forth within this incident.

**Retaliation Incident No. 3: Excluded from**
**Two (2) Departmental Meetings (Both Discrete Acts)**
(Defendants NCC, Past President Williams, Dean Kornbluth and Chair DeSpagna)

120.     Plaintiff alleges that it is the custom, policy and practice of Defendant NCC to require departmental meetings, inclusive of faculty and professional staff, to ensure effective communications across the institution.

121.     Plaintiff alleges that all academic departments across Defendant NCC conduct regular departmental meetings, which was also the practice within the Accounting & Business Administration Department.

122.    Plaintiff alleges that departmental meetings generally cover a host of subjects, including such items as contemplated program changes, class scheduling and informational matters affecting the department and college (all relevant to Plaintiff's employment and duties).

123.    Plaintiff alleges that during the pre-COVID-19 shutdown period (i.e., January 21, 2020 through March 9, 2020), the Accounting & Business Administration Department conducted two (2) departmental meetings in the conference room in Cluster A, occurring on February 6, 2020 and March 5, 2020.

124.    Relative to both departmental meetings, Plaintiff was not: (a) informed of such meetings; (b) provided with meeting agendas; and (c) supplied with copies of materials relevant to the topics being discussed.

125.    Plaintiff alleges that, except for him, all other staff members of the Accounting & Business Administration Department were informed of such meetings and supplied with the corresponding agendas and relevant information.

126.    Plaintiff alleges that his exclusion from attending departmental meetings was in contravention to the customs, policies and practices of Defendant NCC and the Accounting & Business Administration Department (referring to ¶¶ 120-121).

127.    Plaintiff's subjective reaction to his exclusion from departmental meetings was one of despair, recognizing that it was yet another form of isolation which prevented him from collaborating with his co-workers and contributing to the departmental goals and objectives.

128.    Plaintiff alleges that it was Defendant Chair DeSpagna's duty and responsibility to inform all faculty and professional staff of an ensuing departmental meeting and supply them with the appropriate materials to participate.

129.    Plaintiff alleges that it was Defendant Chair DeSpagna (with Defendant Dean Kornbluth's tacit approval), who intentionally excluded Plaintiff from participating in these departmental meetings.

130.   Plaintiff alleges that the actions of Defendants Chair DeSpagna and Dean Kornbluth, to intentionally exclude him from these departmental meetings, were entirely motivated by retaliatory animus.

131.   Plaintiff realleges that Defendants Dean Kornbluth and Chair DeSpagna had full knowledge of Plaintiff's statutorily protected activities (referring to ¶¶ 56-57).

132.   Plaintiff realleges that both Defendants Dean Kornbluth and Chair DeSpagna exacted their campaign of retaliation at the very first opportunity they had (i.e., when Plaintiff began his new full-time position with Defendant NCC).

133.   Due to Plaintiff's belief that he was being subjected to retaliatory behavior, he wrote a detailed letter (referring to ¶ 95) to Defendant Past President Williams, detailing a host of issues requiring remedial action.

134.   With respect to this incident involving exclusion from departmental meetings, in the certified letter of March 6, 2020, Plaintiff wrote (in relevant part), the following:

> "[…] the Department has excluded me from all email distribution lists, including notification of departmental meetings, which I am not precluded from attending.  A copy of the February 6, 2020 departmental meeting minutes, showing that I am not listed as a department member, is attached hereto as Exhibit B.  These circumstances, taken with my questionable office location, has resulted in total isolation from the very department the College has represented is in dire need of an advisement professional."

135.   Plaintiff realleges that Defendant Past President Williams had full knowledge of his statutorily protected activities (referring to ¶ 58).

136.   Plaintiff realleges that Defendant Past President Williams did not respond to the letter and neither he nor anyone else at Defendant NCC took steps to address these incidents, thereby allowing the retaliation to continue unabated.

137.   Plaintiff repeats and realleges the allegations set forth in ¶¶ 100-102, with the same force and effect as if set forth within this incident.

**Retaliation Incident No. 4: Withholding of**
**Secretarial Services and Support**
(Defendants NCC, Past President Williams, Dean Kornbluth and Chair DeSpagna)

138.    On or about January 8, 2020 (prior to the start of the spring 2020 semester), Plaintiff visited Defendant NCC's campus for purposes of becoming familiar with the Accounting & Business Administration Department layout.

139.    During Plaintiff's campus visit on January 8, 2020, Defendant Chair DeSpagna was not present, presumably still on the college's winter intersession break.

140.    While visiting the campus on said date, Plaintiff encountered Melanie Seger (Ms. Seger), who is the secretary for the Accounting & Business Administration Department.

141.    During the campus visit, Ms. Seger graciously welcomed Plaintiff, further indicating that she knew he would be soon joining the department as an academic advisor.

142.    Plaintiff alleges that the duties of departmental secretaries are relatively common across academic departments at Defendant NCC, including supplying secretarial support to faculty and professional staff.

143.    During Plaintiff's encounter with Ms. Seger, she informed him that she would be pleased to assist with a variety of secretarial functions, including: (a) preparing proforma time sheets (i.e., a required submission to payroll bi-weekly); (b) assistance in scheduling advisement appointments with students; (c) maintenance of a calendar of advisement appointments; (d) making copies; and (e) any other secretarial functions customarily provided to the departmental faculty and professional staff.

144.    Plaintiff's subjective reaction to his encounter with Ms. Seger was favorable, feeling pleased that Ms. Seger had been outwardly cooperative and fully willing to provide secretarial support.

145.    Based on his positive encounter with Ms. Seger and after the start of his employment on January 21, 2020, Plaintiff made several requests of Ms. Seger to supply him with time sheets for upcoming pay periods, which she did not supply.

146.    Given her previous offer to supply time sheets and provide secretarial support, Plaintiff reached out again to Ms. Seger to inquire about the status of the time sheets.

147.    In response to his inquiry, Ms. Seger informed Plaintiff that she would no longer be assisting him with time sheets or any other secretarial support.

148.    When Plaintiff inquired as to what had changed regarding her secretarial support, Ms. Seger apologetically informed him that she was instructed by "John" (i.e., Defendant Chair DeSpagna), not to supply time sheets or provide such support.

149.    Plaintiff did not press Ms. Seger any further regarding secretarial support, recognizing that she had been placed in an untenable situation by Defendant Chair DeSpagna.

150.    Plaintiff's subjective reaction to the turnabout in Ms. Seger's cooperation was one of complete surprise given that she had been so welcoming on January 8, 2020, while Defendant Chair DeSpagna was not present (referring to ¶¶ 138-144).

151.    Plaintiff alleges that Defendant Chair DeSpagna is the proximate cause for the change in cooperation originally offered by Ms. Seger, with DeSpagna directing her to withhold secretarial support and leave Plaintiff to fend for himself.

152.    Plaintiff alleges that, but for Defendant Chair DeSpagna's intervention, Ms. Seger would have fully cooperated in supplying secretarial support to Plaintiff, in similar fashion to other members of the department.

153.    Plaintiff's subjective reaction to Defendant Chair DeSpagna's intervention was that he was making every effort to marginalize Plaintiff, with the express purpose of making his employment experience at NCC as unpleasant as possible.

154.    Plaintiff further alleges that Defendant Chair DeSpagna's actions (with Defendant Dean Kornbluth's tacit approval), in denying Plaintiff secretarial support, were entirely motivated by retaliatory animus.

155.    Plaintiff realleges that Defendants Dean Kornbluth and Chair DeSpagna had full knowledge of Plaintiff's statutorily protected activities (referring to ¶¶ 56-57).

156.    Plaintiff realleges that both Defendants Dean Kornbluth and Chair DeSpagna exacted their campaign of retaliation at the very first opportunity they had (i.e., when Plaintiff began his new full-time position with Defendant NCC).

157.    Due to Plaintiff's belief that he was being subjected to retaliatory behavior, he wrote a detailed letter (referring to ¶ 95) to Defendant Past President Williams, detailing a host of issues requiring remedial action.

158.    With respect to this incident involving the withholding of secretarial support, in the certified letter of March 6, 2020, Plaintiff wrote (in relevant part), the following:

> "As to secretarial support, after initially offering to assist me in any way possible, the departmental secretary is no longer cooperative.  When asked what had changed, the secretary stated apologetically that the Department Chair instructed her otherwise."

159.    Plaintiff realleges that Defendant Past President Williams had full knowledge of his statutorily protected activities (referring to ¶ 58).

160.    Plaintiff realleges that Defendant Past President Williams did not respond to the letter and neither he nor anyone else at Defendant NCC took steps to address the incident, thereby allowing the retaliation to continue unabated.

161.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 100-102, with the same force and effect as if set forth within this incident.

**Retaliation Incident No. 5: Withholding of Severance Pay from Prior Adjunct Service**
(Defendants NCC, Past President Williams and V.P. Izquierdo)

162.    Under the Stipulation (referring to ¶ 49), Plaintiff was obligated to resign his position on the adjunct teaching faculty at the end of the Fall 2019 semester, with Defendant NCC obligated to pay any amounts owed from such service, including compensation related to accumulated unused leave ("severance pay").

163.    Consistent with the Stipulation, by letter dated December 23, 2019, Plaintiff submitted his resignation from adjunct service to the NCC Office of Human Resources, further requesting payment of his severance pay relating to such position.

164.    Plaintiff submitted his request for severance pay within the immediate temporal proximity (i.e., within four (4) days) of the consummation of the settlement of the prior lawsuit (referring to ¶ 46).

165.    Plaintiff alleges that it is the custom, policy and practice of Defendant NCC to promptly pay severance claims so that resigning/retiring employees may avail themselves of an income deferral option that expires seventy-five (75) days subsequent to their termination.

166.    Relative to Plaintiff's severance pay, by letter dated December 31, 2019, Defendant NCC's payroll department supplied him with a form entitled "Employee Claim For Severance Payment", along with a calculation showing that Plaintiff was owed $4,323.46 for eighteen (18) days of unused leave.

167.    Plaintiff reviewed the severance calculation supplied, finding that he was actually owed $6,849.50 and had been shorted by $2,526.04, resulting from calculation errors in the number of unused days and daily rate of compensation.

168.    By email dated January 6, 2020, Plaintiff contacted Altine Fede ("Payroll Supervisor"), informing her of the severance pay calculation discrepancy (with explanations), further offering to meet with her to discuss the differences.

169.   By email also dated January 6, 2020, the Payroll Supervisor replied indicating that she would be pleased to meet with Plaintiff at his convenience.

170.   By email dated January 7, 2020, Plaintiff informed the Payroll Supervisor that he would stop by her office at 10:00 a.m. on January 8, 2020.

171.   By email also dated January 7, 2020, the Payroll Supervisor responded:

"Tomorrow is no good for me. I am cc our Vice President of Finances, Julio W. Izquierdo for his reference."

172.   Plaintiff's subjective reaction to the Payroll Supervisor's response was one of puzzlement since she could have simply supplied Plaintiff with an alternative meeting time, without involving Defendant V.P. Izquierdo.

173.   By email also dated January 7, 2020, Plaintiff responded to the Payroll Supervisor by offering an alternative meeting time at 10:00 a.m. on January 9, 2020.

174.   The Payroll Supervisor did not acknowledge or respond to Plaintiff's email wherein he offered an alternative meeting time.

175.   Plaintiff alleges that Defendant V.P. Izquierdo instructed the Payroll Supervisor not to meet with Plaintiff, thereby precluding a prompt resolution to the severance pay calculation.

176.   Plaintiff's subjective reaction to his email exchanges with the Payroll Supervisor was that any resolution of the severance pay discrepancy would require involvement of Defendant V.P. Izquierdo.

177.   By email dated January 10, 2020, Plaintiff received a response from Defendant V.P. Izquierdo, implying that he reviewed Plaintiff's severance pay calculation and found that the difference in amount was attributed to revisions in the Adjunct Faculty Association ("AFA") labor agreement, which had not yet gone into effect.

178.    Plaintiff's subjective reaction to the explanation supplied by Defendant V.P. Izquierdo was one of puzzlement because Plaintiff had direct knowledge that such explanation was untruthful and entirely false.

179.    By email dated January 13, 2020, Plaintiff responded to Defendant V.P. Izquierdo by identifying the fundamental flaw in the Payroll Supervisor's calculation and informing him that the revisions to the AFA contract had been previously approved by the Nassau County Legislature on December 16, 2019 (Resolution No. 235-2019).

180.    In Plaintiff's email of January 13, 2020, he also requested a meeting with Defendant V.P. Izquierdo to resolve the discrepancy in severance pay.

181.    Defendant V.P. Izquierdo did not acknowledge or respond to Plaintiff's email of January 13, 2020, nor did he schedule the requested meeting.

182.    Not having received a response from Defendant V.P. Izquierdo after more than two (2) weeks, by email dated January 28, 2020, Plaintiff reiterated his explanation as to why the Payroll Supervisor's calculation was flawed and repeated his request to meet with Izquierdo to resolve the discrepancy in severance pay.

183.    Defendant V.P. Izquierdo did not acknowledge or respond to Plaintiff's email of January 28, 2020, nor did he schedule the requested meeting.

184.    Not having received a response or acknowledgement from Defendant V.P. Izquierdo for yet another week, by email dated February 4, 2020, Plaintiff provided a more detailed calculation of the severance pay owed, further requesting Izquierdo to process the payment or identify any objectionable portion of the calculation, along with supplying the rationale for such objection.

185.    By email also dated February 4, 2020, Defendant V.P. Izquierdo responded by indicating that he would review the severance pay calculation with the Payroll Supervisor and get back to Plaintiff after he completed his analysis.

186.    By email dated February 5, 2020, Plaintiff supplied additional information to Defendant V.P. Izquierdo, further offering to meet with him and the Payroll Supervisor to bring closure to the matter.

187.    Defendant V.P. Izquierdo did not respond to Plaintiff's offer to meet, nor did he get back to Plaintiff regarding the severance pay discrepancy, thereby leaving Plaintiff without his pay and in continuous limbo.

188.    Due to his belief that he was being subjected to retaliatory behavior, Plaintiff wrote a detailed letter (referring to ¶ 95) to Defendant Past President Williams, detailing a host of issues requiring remedial action.

189.    With respect to this incident involving the delay in processing Plaintiff's severance pay, in the certified letter of March 6, 2020, Plaintiff wrote (in relevant part), the following:

> "[…] [C]ompensation regarding severance (approximately $7,000) from my previous adjunct service is being unduly withheld over a dispute regarding the calculation of such amount.  Through numerous emails over a period of more than two (2) months, this matter has been called to the attention of the College's Vice President of Finance, who has not responded or justified the College's position.  In fact, the delay in response has exhausted the 75-day time period for eligible income tax deferrals, all to my detriment.

190.    Plaintiff realleges that Defendant Past President Williams had full knowledge of his statutorily protected activities (referring to ¶ 58).

191.    Plaintiff realleges that Defendant Past President Williams did not respond to the letter and neither he nor anyone else at Defendant NCC took steps to address the incident, thereby allowing the retaliation to continue unabated.

### DURING COVID-19 SHUTDOWN
(Beginning on March 10, 2020)

### Retaliation Incident No. 5 (continued): Withholding of Severance Pay
(Defendants NCC, Past President Williams and V.P. Izquierdo)

192.    Without any response from Defendants Past President Williams and V.P.

Izquierdo, in a telephone conference on March 13, 2020, Plaintiff reached out to David Kwee,

Esq., Ingerman Smith, L.L.P. (i.e., NCC's outside legal counsel involved in the previous

lawsuit), seeking his assistance in resolving the severance pay dispute.

193.    Over the ensuing weeks, Plaintiff and Attorney Kwee remained in contact, with

Kwee indicating in an email dated March 27, 2020, the following:

> "Ok, I'll push the severance issue to the forefront to see if we can discuss that one and get
> back to you."

194.    Not having received any feedback from Defendants Past President Williams, V.P.

Izquierdo or Attorney Kwee for such an extended period, Plaintiff sent another email to Kwee on

June 4, 2020, informing him that Defendant NCC needs to resolve the severance pay issue

"without further delay".

195.    By email dated June 5, 2020, Attorney Kwee responded:

> "I'll inquire and get back to you."

196.    Over the ensuing weeks (without citing each email), Plaintiff continued to

exchange emails with Attorney Kwee, believing that Kwee endeavored to facilitate a resolution

to the severance pay dispute, including encouraging Defendant NCC to reach out to Plaintiff.

197.    On or about June 15, 2020, Defendant V.P. Izquierdo contacted Plaintiff (at his

residence) by telephone, informing Plaintiff that he would be supplying a revised severance pay

calculation in the mail.

198.    During the telephone conversation occurring on June 15, 2020, Defendant V.P.

Izquierdo snidely inferred to Plaintiff that he was being somewhat greedy and that he should be

satisfied with the revised severance pay amount, given all the money Plaintiff had already received from Defendant NCC.

199.    Plaintiff's subjective reaction to Defendant V.P. Izquierdo's snide remark was one of shock since Izquierdo was undoubtedly referring to the large payments made to Plaintiff by NCC, resulting from the settlement of the prior lawsuit (i.e., a statutorily protected activity).

200.    Plaintiff alleges that Defendant V.P. Izquierdo's snide remark is direct evidence of retaliatory motive resulting from Plaintiff's pursuit of statutorily protected activities.

201.    On or about June 18, 2020, Plaintiff received the revised calculation in the mail (at his residence), showing a revised severance pay amount of $4,794.67.

202.    Also on June 18, 2020, Plaintiff received an email from Defendant V.P. Izquierdo (with a spreadsheet attachment), showing the details of the revised severance pay calculation.

203.    Plaintiff carefully reviewed the revised severance pay calculation, finding that it was still understated by $2,054.83.

204.    By email dated June 22, 2020, Plaintiff again informed Defendant V.P. Izquierdo that the revised severance pay calculation was incorrect, further explaining in excruciating detail the erroneous assumptions used by the Payroll Supervisor, while also reiterating his demand for prompt payment of the larger amount calculated by Plaintiff.

205.    Plaintiff alleges that Defendant V.P. Izquierdo's apparent intransigence in accepting Plaintiff's severance calculation was entirely illogical since the error in the Payroll Supervisor's calculation was patently obvious.

206.    By email dated July 2, 2020, Defendant V.P. Izquierdo suggested a meeting among Plaintiff, the Payroll Supervisor and himself, which took place virtually on July 9, 2020 (via Zoom conference).

207.    At the virtual meeting held on July 9, 2020, despite concrete evidence to the contrary, Defendant V.P. Izquierdo persisted in his position that his severance pay calculation was correct.

208.    Also at the July 9, 2020 virtual meeting, and in total exasperation, Plaintiff offered to prepare model calculations to further elucidate the erroneous nature of Defendant V.P. Izquierdo's position, also offering to meet again in the hopes of a resolution.

209.    By email dated July 13, 2020, Plaintiff supplied Defendant V.P. Izquierdo with several model calculations, for a virtual meeting scheduled to take place on July 16, 2020.

210.    There were several intervening email exchanges prior to the July 16, 2020 virtual meeting, yet despite conclusive evidence that Plaintiff's severance pay calculation methodology was correct, Defendant V.P. Izquierdo continued to deny the obvious (i.e., that Plaintiff was owed in excess of $2,000 more than what Izquierdo calculated).

211.    Immediately following the virtual meeting occurring on July 16, 2020, there were several email exchanges among Defendant V.P. Izquierdo, Laurie Pezzullo (NCC's Assistant Vice President for Labor Relations) and Plaintiff, none of which brought about a resolution.

212.    In Plaintiff's final email sent on July 16, 2020, he informed Defendant V.P. Izquierdo and AVP Pezzullo that, if NCC agreed to pay Plaintiff the amount claimed ($6,849.50), the matter would be resolved, and if not, Plaintiff would have no choice but to pursue a resolution through the AFA grievance procedure.

213.    Although Plaintiff had done everything humanly possible to resolve the matter without AFA involvement or litigation, on July 27, 2020, Plaintiff filed a comprehensive grievance against Defendant V.P. Izquierdo, alleging a violation of AFA Contract Section 9.7, involving Improper Calculation and Payment of Unused Leave Time.

214.    After the filing of the grievance, it became the AFA's responsibility to pursue the matter through the contractually established grievance procedure.

215.    Regarding the grievance, on or about August 10, 2020, Plaintiff received a telephone call at his personal residence from John Gross, Esq., Ingerman Smith L.L.P. (i.e., NCC's outside legal counsel).

216.    Attorney Gross informed Plaintiff that he reviewed the grievance and that he was recommending to Defendant NCC to settle the grievance for the entire amount claimed by Plaintiff ($6,849.50), further noting that he did not see the need to engage in litigation with Plaintiff and the AFA with respect to the disputed amount.

217.    Attorney Gross also informed Plaintiff that he was on vacation (visiting his grandchildren), and that when he returned, he would ensure that a settlement agreement would be prepared and forwarded to Plaintiff and the AFA for review and comment.

218.    Plaintiff's subjective action to having directly received a telephone call from Attorney Gross (who should have contacted the AFA's legal counsel), is that even Gross immediately recognized the absurdity of Defendant V.P. Izquierdo's position and wanted the issue to be promptly resolved.

219.    On or about August 24, 2020, Attorney Gross supplied the AFA with a Settlement Agreement ("Agreement"), which (with minor revisions), was executed on or about September 4, 2020 by Plaintiff, Stefan Krompier (AFA President) and Defendant Past President Williams.

220.    The Agreement required approval by the NCC's Board of Trustees (approved on September 8, 2020), after which Defendant NCC had sixty (60) calendar days in which to make payment of the agreed upon amount of $6,849.50, further noting that an untimely payment would nullify and void the Agreement per stipulation of the parties (specific language follows):

> "This Agreement shall not be effective or binding unless and until approved, through formal resolution of the BOARD.  If, in the event this Agreement is not approved by the BOARD within forty-five (45) calendar days after fully executed, or if payment is not made within sixty (60) calendar days after BOARD approval, this entire Agreement shall be deemed null and void, and the grievance shall be fully restored to Step II of the grievance procedure within the AFA collective bargaining agreement, by stipulation of the parties."

221.     Based on the terms of the Agreement, which was approved by Defendant NCC's Board of Trustees on September 8, 2020, NCC was required to make the agreed upon payment to Plaintiff by November 7, 2020.

222.     Despite the execution and timely approval of the Agreement by its Board of Trustees, Defendant NCC failed to make the payment within the specified timeframe, thereby rendering the Agreement null and void, further causing more harm and inconvenience to Plaintiff and the AFA.

223.     Plaintiff alleges that it was Defendant V.P. Izquierdo's duty to timely execute the financial terms of the Agreement, which he purposely ignored, thereby rendering the Agreement null and void.

224.     Plaintiff alleges that Defendant Past President Williams had a duty to oversee and ensure Defendant NCC's compliance with the Agreement, yet he ignored such duty in similar fashion to each of Plaintiff's previous requests for assistance (referring to ¶¶ 95-99; 115-118; 133-136; 157-160; and 188-191).

225.     Upon the Agreement being rendered null and void resulting from Defendant NCC's non-payment of the specified amount, the AFA restored the grievance and tenaciously pursued the amount due Plaintiff, encountering obstacle after obstacle, all put forth by Defendant V.P. Izquierdo.

226.     Without citing the considerable efforts put forth by the AFA, Plaintiff was not properly compensated for his severance pay until March 20, 2021 (i.e., nearly fifteen (15) months after it was earned and more than four (4) months after the date in the Agreement).

227.     Plaintiff alleges that, after the execution of the Agreement, Defendant V.P. Izquierdo had no legitimate basis to dispute the severance amount because it had been recommended by NCC's attorneys, authorized by Defendant Past President Williams and approved by the Board of Trustees.

228.    Plaintiff alleges that despite considerable efforts undertaken by NCC's outside legal counsel, the AFA and Plaintiff to resolve the severance pay dispute, Defendant V.P. Izquierdo willfully and wantonly ignored the terms of the Agreement, thereby rendering it null and void.

229.    Plaintiff alleges that Defendant V.P. Izquierdo took no steps to mitigate the harm to Plaintiff by withholding the entire severance amount of $6,849.50, instead of at least liquidating the amount of $4,794.67, which had already been acknowledged by Izquierdo to be due and payable to Plaintiff (referring to ¶¶ 201-202).

230.    Plaintiff alleges that Defendant V.P. Izquierdo's actions were motivated by retaliatory animus since he: (a) was fully aware of Plaintiff's protected activities (referring to ¶ 59); and (b) he made a snide comment that Plaintiff should be satisfied, given all the money that he had already received from Defendant NCC (referring to ¶¶ 197-200).

231.    Plaintiff alleges that the extended delay of nearly fifteen (15) months in the processing of his severance pay resulted in the expiration of the seventy-five (75) days window for income deferral available to all employees, further resulting in the delay of reporting the income from tax year 2020 to 2021, when Plaintiff was subjected to a higher income tax rate.

232.    Plaintiff alleges that the cumulative effect from: (a) being foreclosed from the seventy-five (75) days income deferral window; and (b) delaying the income until tax year 2021, resulted in Plaintiff incurring approximately $2,500 in additional income taxes that could have been legally avoided had Defendant NCC made timely payment (i.e., an amount equal to what had been in dispute).

233.    Plaintiff alleges that the lack of timely payment effectively resulted in the diminution of an employee benefit that he had earned while serving on the adjunct faculty.

234.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 100-102, with the same force and effect as if set forth within this incident.

**Retaliation Incident No. 6: Marginalization from Duties during Remote Operations**
(Defendants NCC, Past President Williams, Dean Kornbluth and Chair DeSpagna)

**Note**: *This incident is effectively a continuation of Incident No. 2.  However, there are additional allegations that warrant a separate incident within the context of the COVID-19 campus shutdown.*

235.    By email dated March 10, 2020, Defendant Past President Williams announced the start of the COVID-19 campus shutdown, advising employees that they were expected to work remotely during their normally scheduled work hours, in coordination with direct supervision as to a plan for assignments during this time.

236.    By email dated March 11, 2020, Defendant Past President Williams updated the campus on the shutdown, further indicating that with respect to remote work, "Supervisors will be in contact regarding specific expectations."

237.    For the period from March 10 through May 18, 2020 (the end of the spring 2020 semester), Defendant Chair DeSpagna did not send a single communication (email, telephone message, or otherwise), updating Plaintiff on specific expectations during the campus shutdown.

238.    Plaintiff alleges that Defendant Chair DeSpagna regularly communicated with other departmental members, informing them on changing circumstances and expectations during the extended shutdown, while totally excluding Plaintiff (i.e., leaving him in the dark).

239.    For the period from March 10 through May 18, 2020 (the end of the spring 2020 semester), Plaintiff remained on call during his normal work hours (continuously monitoring email and voicemail), with virtually no activity for the entire semester.

240.    For the stated period (in excess of two (2) months), Plaintiff was ready, willing and able to provide advisement services to students, but instead sat idle at his home, aimlessly monitoring his email and voicemail for some instructions or activity (which never came).

241.    As was the situation prior to the campus shutdown, Plaintiff's subjective reaction to remaining idle for such an extended timeframe was that he had been totally isolated and

intentionally marginalized due to his pursuit of a host of protected activities, including the prior lawsuit.

242.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 108-110, with the same force and effect as if set forth within this incident.

243.    Plaintiff alleges that Defendant Chair DeSpagna (with Defendant Dean Kornbluth's tacit approval) was responsible for keeping Plaintiff uninformed of changing circumstances (i.e., out of the loop), thereby preventing the establishment of alternative expectations.

244.    Plaintiff alleges that, except for the two (2) week semester start-up periods, the facts and circumstances outlined for the spring 2020 were representative of what Plaintiff experienced for each of the subsequent semesters during the shutdown, which included fall 2020, spring 2021 and fall 2022.

245.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 112-114 and 117, with the same force and effect as if set forth within this incident.

246.    Plaintiff realleges that Defendant Past President Williams had been informed of such circumstances prior to the start of the campus shutdown (referring to ¶¶ 115-116 and 118), and neither he nor anyone else within Defendant NCC took steps to address them, thereby allowing the retaliation to continue unabated.

247.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 100-102, with the same force and effect as if set forth within this incident.

### Retaliation Incident No. 7: Exclusion from Fifteen (15)
### "Virtual" Departmental Meetings (All Discrete Acts)
(Defendants NCC, Past President Williams, Dean Kornbluth and Chair DeSpagna)

**Note**: *This incident is effectively a continuation of Incident No. 3. However, there are additional allegations that warrant a separate incident within the context of the COVID-19 campus shutdown.*

248.     As was the case across academia, Defendant NCC relied extensively on virtual communications during the COVID-19 shutdown by utilizing Zoom conferencing software.

249.     During the shutdown, academic departments across the NCC campus conducted regular departmental meetings virtually, which was also the practice within the Accounting & Business Administration Department.

250.     Plaintiff repeats and realleges the allegation set forth in ¶ 122, with the same force and effect as if set forth within this incident.

251.     Plaintiff alleges that departmental meetings during the shutdown took on an elevated purpose due to the extraordinary circumstances and the need to update staff on changing procedures and expectations (particularly relevant while Plaintiff was operating remotely).

252.     Plaintiff alleges that during the COVID 19 shutdown and shortly thereafter, the Accounting & Business Administration Department conducted fifteen (15) virtual departmental meetings occurring on: April 16, 2020; May 7, 2020; May 18, 2020; September 17, 2020; October 15, 2020; November 19, 2020; December 17, 2020; February 4, 2021; March 4, 2021; April 15, 2021; May 13, 2021; September 14, 2021; October 12, 2021; November 9, 2021; and December 21, 2021.

253.     Relative to these meetings, Plaintiff was not: (a) informed of such meetings; (b) provided with meeting agendas; (c) supplied with copies of materials relevant to the topics being discussed; and (d) advised of Zoom conferencing links.

254.     Plaintiff alleges that, except for him, all other members of the department were informed of such meetings and supplied with the corresponding information, including appropriate Zoom conferencing links.

255.     Plaintiff repeats and realleges the allegations set forth in ¶¶ 126-132 and 135, with the same force and effect as if set forth within this incident.

256.    Plaintiff realleges that Defendant Past President Williams had been informed of such circumstances prior to the start of the campus shutdown (referring to ¶¶ 133-134 and 136), and neither he nor anyone else within Defendant NCC took steps to address them, thereby allowing the retaliation to continue unabated.

257.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 100-102, with the same force and effect as if set forth within this incident.

**Retaliation Incident No. 8: Withholding Information Specific to Plaintiff's Duties**
(Defendants NCC, Dean Kornbluth and Chair DeSpagna)

258.    Due to the extended COVID-19 shutdown, Defendant NCC, through its Director of Academic Advisement, Amanda Fox ("Director Fox"), developed a remote Zoom application to consolidate student advisement for the Fall 2020 semester across all academic departments and discrete programs.

259.    Plaintiff, along with other college employees involved in academic advisement, received instructions and training from Director Fox (during the summer), in preparation for the fall 2020 semester start-up.

260.    By all measures, the remote application developed under Director Fox was entirely effective and Plaintiff was fully satisfied with his involvement and participation in the process.

261.    Believing that the advisement process used for the fall 2020 semester start-up would also be used for the spring 2021 start-up, Plaintiff reached out to Director Fox for information regarding the required Zoom links pertinent to his duties.

262.    By email dated January 7, 2021, Plaintiff wrote to Director Fox (in relevant part), the following:

"Regarding Monday morning's advisement session (1/11), is the Zoom link identified in the training course or will it be separately supplied."

263.    By email also dated January 7, 2021, Director Fox replied (in relevant part):

"This link was a link created by your department that was provided to us. We won't be facilitating advisement sessions for discrete programs. You should have the meeting ID and have the ability to be a host to welcome students from the waiting room. I would suggest contacting your department secretary for this info."

264.    By email dated January 10, 2021 (Sunday - 9:57 a.m.), Plaintiff wrote to Director

Fox (cc Defendants DeSpagna and Kornbluth) (in relevant part), the following:

"I'm scheduled for advisement on Monday and Tuesday of this week and need assistance so that I'm up to speed on hosting. I would appreciate some direction and/or training on the hosting process. As of now, this information has not been supplied by my department. Sorry for bothering you on the weekend, but during these unusual circumstances, I want to be prepared to service our students properly."

265.    By email also dated January 10, 2021 (Sunday - 10:24 a.m.), Director Fox replied

(cc Defendants DeSpagna, Kornbuth) (in relevant part):

"This was discussed months ago at a chairs meeting. The assumption was that the department would communicate this information to the faculty who are assigned to advise. [...] I am sorry for any misunderstanding, but the departments are responsible for communicating any instructions about this process to faculty."

266.    By email also dated January 10, 2021 (Sunday - 11:10 a.m.), Plaintiff wrote to

Director Fox (cc Defendants DeSpagna, Kornbluth) (in relevant part), the following:

"This change in the advisement process was never communicated to me by the department. [...] Again, let me apologize for bothering you over the weekend. However, since I was scheduled for advisement tomorrow morning, I wanted to be up to speed to properly service our students. Now that I know the department is responsible for managing the waiting room/hosting process, I'll follow-up accordingly.

267.    Plaintiff alleges on the facts depicted in ¶¶ 258-266, that Defendant Chair

DeSpagna was fully aware of changes in the remote advising process (entirely relevant to

Plaintiff's duties), yet he failed to disclose them to Plaintiff.

268.    Plaintiff alleges that it was Defendant Chair DeSpagna's responsibility to timely

inform Plaintiff of such procedural changes, especially during the COVID-19 shutdown, while

Plaintiff was working remotely.

269.    Plaintiff alleges that it was unconscionable of Defendant Chair DeSpagna to leave Plaintiff totally uninformed about a procedural change affecting his duties.

270.    Plaintiff alleges that Defendant Chair DeSpagna's inaction (i.e., in keeping Plaintiff uninformed through the very day before [on a Sunday] a procedural change would take effect), was even more egregious given Defendant Past President William's previous direction that Supervisors were to keep employees informed regarding changing expectations during the campus shutdown (referring to ¶¶ 235-236).

271.    Plaintiff alleges that if he had not reached out to Director Fox, he would have been entirely ignorant of changes made to the advisement process, directly relevant to his duties.

272.    Plaintiff alleges that Defendant Chair DeSpagna's inaction, in not informing him of procedural changes relevant to his position, was entirely motivated by retaliatory animus (i.e., hoping to make Plaintiff look incompetent and unprepared relative to his duties).

273.    Plaintiff alleges that Defendant Dean Kornbluth was fully aware of these circumstances and did nothing to dissuade Defendant DeSpagna, instead giving him encouragement to cause harm to Plaintiff.

274.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 80-82 and 100-102, with the same force and effect as if set forth within this incident.

## POST-COVID-19 SHUTDOWN

### Retaliation Incident No. 9: Office Debacle Resulting in Isolation
(Defendants NCC, Past President Williams, Officer Haugen, Dean Kornbluth and Chair DeSpagna)

**Note**: *This incident is effectively a continuation of Incident No. 1.  However, there are additional allegations that warrant a separate incident within the context of the Post-COVID-19 resumption of normal campus operations.*

275.    During the Fall 2021 semester, Defendant NCC began resuming on-campus operations, slowing restoring functions while maintaining strict COVID-19 protocols.

276. Relative to Plaintiff's department (i.e., Accounting & Business Administration), there had been five (5) retirements during the shutdown (all occurring on October 1, 2020), including: Maryann Capone; Andrew DeJoseph; Joseph Gray; David Nugent; and Marguerite Teubner.

277. Relative to these retirements, five (5) additional offices became vacant within Plaintiff's department, all located within Cluster A, including office nos.: A3003; A3008; A3009; A3010; and A3021.

278. Taking into consideration empty office A3000 (referring to ¶¶ 83-86) and the five (5) vacated offices due to retirements, there were a total of six (6) available offices in Cluster A for Plaintiff to use as the campus was returning to normal operations.

279. On December 8, 2021, Defendant Chair DeSpagna sent an email to Plaintiff (cc Defendant Dean Kornbluth), directing him to return to campus on Monday, December 13, 2021.

280. Plaintiff complied with Defendant Chair DeSpagna's direction, returning to campus on the specified date.

281. Despite the availability of six (6) vacant offices in Cluster A, Defendant Chair DeSpagna continued to maintain Plaintiff's office location in Cluster D, Office D3119.

282. Plaintiff repeats and realleges the allegations set forth in ¶¶ 64-78, with the same force and effect as if set forth within this incident.

283. Plaintiff alleges that given the abundance of available office space (i.e., six (6) vacant offices), there was no justification whatsoever to continue separating Plaintiff from the department to which he was assigned and the students he was hired to serve.

284. Plaintiff alleges that Defendants Dean Kornbluth and Chair DeSpagna were directly responsible for maintaining Plaintiff's remote office location, in contravention to the customs, policies and practices of Defendant NCC (referring to ¶ 66) and the Stipulation (referring to ¶ 52).

285.    Plaintiff alleges that the ongoing actions of Defendants Dean Kornbluth and Chair DeSpagna, to continue isolating Plaintiff from his assigned department, were entirely motivated by retaliatory animus.

286.    Plaintiff alleges that Defendant Chair DeSpagna's retaliatory animus was so extreme that during the Spring 2022 semester start-up period, he (along with his secretary) directed numerous students to traverse the construction zone in Cluster C (i.e., posted restricted hard hat zone), to meet with Plaintiff in Cluster D.

287.    Plaintiff alleges that in their retaliatory rage, Defendants Chair DeSpagna and Dean Kornbluth were willing to subject students to physical harm (i.e., traversing a construction zone), instead of properly locating Plaintiff within any of the six (6) vacant offices in Cluster A.

288.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 80-82, with the same force and effect as if set forth within this incident.

289.    Due to Plaintiff's belief that he was being subjected to ongoing retaliatory behavior, he wrote a detailed letter (via U.S. Certified Mail) dated February 8, 2022, to Defendant Officer Haugen (cc Attorney Kwee), detailing several issues requiring remedial action.

290.    With respect to the ongoing nature of the office debacle, in his certified letter of February 8, 2022, Plaintiff wrote (in relevant part), the following:

> "The Agreement stipulates that Plaintiff shall be provided with suitable office space in or around the Accounting and Business Administration Department and access to appropriate office equipment. However, the office provided is in a remote location (far-removed from the department) and obstructed by ongoing construction, thereby precluding safe student access (i.e., students are being directed by the department to pass through the "hard hat" construction zone in Cluster C to reach my office)."

291.    Plaintiff alleges that Defendant Officer Haugen did not acknowledge or respond to Plaintiff's certified letter of February 8, 2022.

292.    Not anticipating a response from Defendant Officer Haugen, Plaintiff followed-up with Attorney Kwee, where they held a brief telephone conference on February 11, 2022.

293.    By email dated February 11, 2022 to Attorney Kwee, Plaintiff memorialized the conference call and wrote the following regarding the questionable office location:

> "**Office Location** - We discussed changing my office location from D3119 to A3010 (empty office), which is located in the proper department and readily accessible to students needing advisement services. This change would also preclude the need for students to traverse the "hard hat" construction zone to reach my current location."

294.    Also memorialized in the February 11, 2022 email was Attorney Kwee's response, that he would contact his client regarding Plaintiff's issues, as follows:

> "**Follow-up** - You indicated that you would reach out to your campus contacts to see if these issues could be addressed and that we would speak sometime next week, most likely next Friday (2/18)."

295.    After several additional email follow-ups by Plaintiff, Attorney Kwee and Plaintiff held a telephone conference on February 25, 2022.

296.    Regarding a change in Plaintiff's office location, Attorney Kwee informed Plaintiff that none of the six (6) vacant offices in Cluster A were available, further explaining that he had been informed by his college contacts that such offices were not suitable or in adequate condition to be occupied.

297.    Plaintiff's subjective reaction to Attorney Kwee's explanation was one of disbelief since Plaintiff knew such an explanation was entirely false.

298.    Plaintiff concluded that Attorney Kwee's explanation was false because Plaintiff knew the staff members who previously occupied such offices and had personally seen that they were fully functional and suitable for Plaintiff's needs.

299.    During the February 25, 2022 telephone conference, Plaintiff informed Attorney Kwee that he had been misinformed by his campus contacts.

300.    Also, during the February 25, 2022 telephone conference, Attorney Kwee indicated that, in lieu of relocating Plaintiff to Cluster A, his client would be receptive to Plaintiff working remotely for the duration of his employment.

301.    Plaintiff's subjective reaction to Attorney Kwee's statement (i.e., client receptive to Plaintiff returning to remote work), was seen as a tacit indication that Defendant NCC would take no action to rein in Defendants Dean Kornbluth and Chair DeSpagna in their persistent retaliation and harassment of Plaintiff.

302.    Plaintiff alleges that Defendant NCC's offer (for him to return to remote work), was yet another form of retaliation since he had every right to be located within the confines of his assigned department within Cluster A, just like every other departmental member returning to campus after the COVID-19 shutdown.

303.    Plaintiff alleges that it was Defendant Officer Haugen (or her representative acting on Haugen's direction) who misinformed Attorney Kwee that the six (6) vacant offices in Cluster A were not suitable, along with putting forth the solution for Plaintiff to return to remote work.

304.    Plaintiff alleges that Defendant Officer Haugen was fully aware of the nature and extent to which Plaintiff was suffering from retaliation because Plaintiff's previous correspondence would have been brought to her attention as NCC's General Legal Counsel (referring to ¶¶ 95-97; 115-116; 133-134; 157-158; and 188-189, documenting a host of questionable behaviors).

305.    Plaintiff alleges that at the time Defendant Officer Haugen was made Officer-in-Charge of Defendant NCC on January 9, 2022 (previously NCC's General Legal Counsel - referring to ¶ 12), she was fully aware of the nature and extent of Plaintiff's plight and had a duty to address it, instead of perpetuating it in the ways described in ¶¶ 302-303.

306.     Plaintiff alleges that Defendant Officer Haugen was aware of the nature and extent of Plaintiff's prior lawsuit, with full knowledge of his protected activities (referring to ¶¶ 53-55).

307.     Plaintiff alleges that Defendant Haugen's inaction in addressing Plaintiff's claims of retaliation was an abdication of her duties as Officer-in-Charge and tantamount to condoning/ratifying the illegal behavior encountered by him.

308.     Plaintiff realleges that Defendant Past President Williams had been informed of such circumstances prior to the start of the campus shutdown (referring to ¶¶ 95-99), and neither he nor anyone else within Defendant NCC took steps to address them, thereby allowing the retaliation to continue unabated.

309.     Plaintiff repeats and realleges the allegations set forth in ¶¶ 100-102, with the same force and effect as if set forth within this incident.

### Retaliation Incident No. 10: Violating Established COVID-19 Protocols
(Defendants NCC, Officer Haugen, Dean Kornbluth and Chair DeSpagna)

310.     To protect students and staff from transmitting the COVID-19 virus, Defendant NCC developed strict health protocols that all employees were expected to implement and maintain.

311.     Strict vaccination and masking protocols were developed for students seeking to attend face-to-face classes, while unvaccinated students were limited to remote and online course offerings.

312.     While Defendant NCC effectively controlled who could enter a classroom, there were a host of other services provided to students (face-to-face on campus), where vaccination status could not be determined (i.e., admissions, advisement, registrar, placement testing, bursar and other student-centric services).

313.    Relative to those employees dealing with functions where student vaccination status could not be determined (like Plaintiff), Defendant NCC developed extensive protocols to prevent virus spread, such as: (a) acrylic barriers between employees and students; (b) hand sanitation stations; (c) mask mandate - including providing masks to all unmasked students; and (d) placing signage in all locations (open to students), outlining the prescribed protocols.

314.    At the time Plaintiff was directed by Defendants Chair DeSpagna and Dean Kornbluth to return to campus on December 13, 2021 (referring to ¶¶ 279-280), the aforementioned COVID-19 protocols had been well-established and DeSpagna and Kornbluth had a duty to follow them.

315.    As an academic advisor, Plaintiff was an employee who had face-to-face encounters with students of an unknown vaccination status, which was known by Defendants Chair DeSpagna and Dean Kornbluth.

316.    It was also known to Defendants Chair DeSpagna and Dean Kornbluth that Plaintiff was a member of the vulnerable population because of Plaintiff's advanced age (69 year of age at the relevant time).

317.    Despite the well-established campus protocols and being aware of Plaintiff's advanced age, Defendant Chair DeSpagna (with Defendant Dean Kornbluth's knowledge), did not provide for a single COVID-19 protocol.

318.    During the spring 2022 semester start-up period (i.e., the height of the Omicron variant outbreak), Plaintiff met with numerous students (referring to ¶ 286) in an unventilated office without a single COVID-19 protocol in place.

319.    Plaintiff's subjective reaction to being denied the standard safety COVID-19 protocols was that Defendants Chair DeSpagna and Dean Kornbluth had no regard for Plaintiff's health, safety and well-being.

320.   Plaintiff alleges that Defendants Chair DeSpagna and Dean Kornbluth were directly responsible for denying Plaintiff the standard safety protocols.

321.   Plaintiff further alleges that the ongoing actions of Defendants Dean Kornbluth and Chair DeSpagna, to deny Plaintiff the standard safety protocols, were entirely motivated by retaliatory animus.

322.   Plaintiff repeats and realleges the allegations set forth in ¶¶ 80-82, with the same force and effect as if set forth within this incident.

323.   Due to Plaintiff's belief that he was being subjected to ongoing retaliatory behavior, he wrote a detailed letter (via U.S. Certified Mail) dated February 8, 2022, to Defendant Officer Haugen (cc Attorney Kwee), detailing several issues requiring remedial action.

324.   With respect to this incident involving violations of established COVID-19 protocols, in his certified letter of February 8, 2022, Plaintiff wrote (in relevant part), the following:

> "Other deficiencies in working conditions include inadequate office equipment relative to the administration and advisement of students, compounded by a complete disregard for COVID-19 safety protocols, which are routinely provided for similarly situated employees involved in face-to-face student advisement services. These circumstances are interfering with the performance of my duties and potentially exposing me to undue COVID-19 risk. Indeed, the College needs to promptly remedy these deficiencies."

325.   Defendant Officer Haugen did not respond to Plaintiff's certified letter of February 8, 2022.

326.   Not anticipating a response from Defendant Officer Haugen, Plaintiff followed-up with Attorney Kwee, where they held a brief telephone conference on February 11, 2022.

327.   By email dated February 11, 2022 to Attorney Kwee, Plaintiff memorialized the conference call and wrote the following regarding the COVID-19 safety protocols:

**"Office Equipment and Covid-19 Safety Protocols** - We discussed outfitting my office location with an updated computer with web-based meeting equipment and software (to conduct remote advisement) and clear acrylic desk shields, both consistent with similarly situated employees advising students."

328.    Also memorialized in the February 11, 2022 email was Attorney Kwee's response, that he would contact his client regarding Plaintiff's issues, as follows:

**"Follow-up** - You indicated that you would reach out to your campus contacts to see if these issues could be addressed and that we would speak sometime next week, most likely next Friday (2/18)".

329.    After several additional email follow-ups by Plaintiff, Attorney Kwee and Plaintiff held a telephone conference on February 25, 2022.

330.    During the telephone conference, Attorney Kwee did not focus on the lack of safety protocols, instead informing Plaintiff that he would not be moved to Cluster A for the reasons outlined above (referring to ¶ 296).

331.    Plaintiff alleges that, without relocating his office to Cluster A and with no intent to supply the standard safety protocols, Defendant NCC essentially offered no alternative but for Plaintiff to return to remote work.

332.    Under such circumstances, Plaintiff agreed to return to remote work on March 1, 2022 and will continue working remotely through the end of his employment on August 31, 2023.

333.    Plaintiff's subjective reaction to being effectively forced to return to remote work was that Defendants Chair DeSpagna and Dean Kornbluth (aided and abetted by Defendant Officer Haugen), were entirely successful in their vindictive campaign to prevent Plaintiff from joining the department in Cluster A, and better yet, getting him off the campus entirely.

334.    Plaintiff alleges that Defendant NCC's reluctance to supply him with the required safety protocols (all within Cluster A), was yet another form of retaliation since Plaintiff had sought nothing more than what had been provided for similarly situated employees.

335.   Plaintiff further alleges that it was Defendant Officer Haugen (or her representative acting on Haugen's direction), who supplied Attorney Kwee with such limited options to resolve Plaintiff's office location and the related COVID-19 safety protocols.

336.   Plaintiff repeats and realleges the allegations set forth in ¶¶ 304-307, with the same force and effect as if set forth within this incident.

337.   Plaintiff repeats and realleges the allegations set forth in ¶¶ 100-102, with the same force and effect as if set forth within this incident.

**Retaliation Incident No. 11: Exclusion from Eight (8)
Departmental Meetings (All Discrete Acts)**
(Defendants NCC, Past President Williams, Officer Haugen, Dean Kornbluth and Chair DeSpagna)

**Note**: *This incident is effectively a continuation of Incident Nos. 3 and 7.  However, there are additional allegations that warrant a separate incident within the context of the Post-COVID-19 campus shutdown.*

338.   Plaintiff repeats and realleges the allegations set forth in ¶¶ 120-122, with the same force and effect as if set forth within this incident.

339.   As the campus began returning to normal operations, departmental meetings continued in a hybrid mode (i.e., some face-to-face and others virtual).

340.   During the Post-COVID 19 period, the Accounting & Business Administration Department conducted eight (8) departmental meetings occurring on: January 27, 2022; February 24, 2022; April 14, 2022; May 12, 2022; September 20, 2022; October 18, 2022; November 15, 2022; and December 13, 2022 (meeting scheduled).

341.   Relative to these meetings, by email dated February 17, 2022, Plaintiff made the following request to Defendant Chair DeSpagna (cc Defendant Dean Kornbluth):

"I see from the administrative calendar posted on the College's website that departmental meetings are scheduled for Thursday (February 24, 2022) at 11:30am to 12:45pm.  As you can appreciate, participating in these meetings is helpful in preparing for student advisement in the coming semesters.  Please provide the meeting agenda and location (Zoom link if remote) for any upcoming departmental meetings (excluding P&B), at the earliest convenience."

342.   Relative to Plaintiff's February 17, 2022 email (requesting information on attending the upcoming departmental meeting), Defendant Chair DeSpagna did not reply, nor did he direct anyone else to supply such information to Plaintiff.

343.   Relative to Plaintiff's February 17, 2022 email, (requesting information on attending the upcoming departmental meeting), Defendant Dean Kornbluth did not reply, nor did he direct anyone else to supply such information to Plaintiff.

344.   Plaintiff's subjective reaction to the lack of response from either Defendants Chair DeSpagna or Dean Kornbluth was that it was confirmation that they collectively and intentionally sought to exclude Plaintiff from departmental meetings, further exhibiting a lack of civility by not even acknowledging Plaintiff's email.

345.   Relative to these meetings, Plaintiff was not: (a) informed of such meetings; (b) provided with meeting agendas; (c) supplied with copies of materials relevant to the topics being discussed; and (d) advised of Zoom conferencing links.

346.   Plaintiff repeats and realleges the allegations set forth in ¶¶ 100-102, 125-132, 256 and 304-307, with the same force and effect as if set forth within this incident.

**Retaliation Incident No. 12: Dubious Work Requirements**
(Defendants NCC, Officer Haugen and Chair DeSpagna)

347.   Relative to his resumption of working remotely (referring to ¶ 332), Plaintiff remained on call during his scheduled work hours, diligently monitoring his NCC email account and office voicemail, to ensure prompt service to students seeking advisement.

348.   As previously alleged (throughout Incident nos. 2 and 6), other than the semester start-up timeframe, student advisement referrals were extremely limited, with Plaintiff remaining idle for extended periods of time.

349.   Relative to the dubious work requirements, on September 20, 2022, Defendant DeSpagna sent an email to Plaintiff demanding the following:

"Please note, you are to be signed in at all times for Zoom advisement to provide immediate advisement to students."

350.    At the time of Defendant DeSpagna's email (September 20th), the semester start-up period had ended and advisement activity was in the usual extended lull, which was well-known by DeSpagna.

351.    Regarding Defendant Chair DeSpagna's demand ("you are to be signed in at all times for Zoom advisement"), DeSpagna is referring to the general department Zoom link, which is fully maintained and monitored by the departmental secretary, Ms. Seger.

352.    As has been the standard practice involving remote advisement, if, in the off chance, a student joins the departmental Zoom link seeking advisement, Ms. Seger informs Plaintiff by email, who promptly joins the link to assist the student.

353.    As to the number of occurrences of a student seeking advisement on the departmental Zoom link, from the date of Defendant Chair DeSpagna's email to the date of this Complaint (i.e., sixty-two [62] days), there has not been a single student referral emanating from the departmental Zoom link, further noting that the last Zoom referral from Ms. Seger occurred on September 7, 2022 (approximately two and one-half [2-1/2] months ago).

354.    By email dated September 20, 2022, Plaintiff responded to Defendant Chair DeSpagna by providing a host of reasons why his demand for Plaintiff to remain logged-in to the departmental Zoom link was unwarranted, ending the email with an invitation for DeSpagna to justify his demand by supplying supporting data, as follows:

"I hope this clarifies the advisement work schedule, which is subject to change as the winter and spring registration periods approach.  Of course, if you have any statistics that demonstrate otherwise or any other suggestions, I would be pleased to consider them."

355.    Defendant Chair DeSpagna did not respond to Plaintiff's email of September 20, 2022, nor did he supply any statistics that would justify his demand for Plaintiff to remain logged-in to the inactive Zoom link.

356.     Plaintiff's subjective reaction to Defendant DeSpagna's demand (i.e., remaining logged-in to an inactive Zoom link already monitored by the departmental secretary, Ms. Seger), was a subversive attempt to have Ms. Seger monitor Plaintiff's activity to ensure that he was shackled to his computer throughout the workday.

357.     Plaintiff felt that remaining logged-in to an inactive Zoom link was entirely dubious and equivalent to wearing an ankle monitor during home confinement.

358.     Not having received a response from Defendant Chair DeSpagna, Plaintiff believed DeSpagna was satisfied with his explanation.

359.     Relative to this matter, on September 26, 2022, Plaintiff received an email from Attorney Kwee, (NCC's outside legal counsel), inquiring about Plaintiff's use of the departmental Zoom platform and stating the following (in relevant part):

> "Please note that in order for remote advising to work through the [Zoom] platform that you are using, it is my understanding that you would be logged into the platform during the time that you are available for advising.  My understanding is that you would be available as if you were sitting in an office so that students could just come in, or in your case, pop in virtually, during designated hours that you are working."

360.     By email dated September 27, 2022, Plaintiff responded to Attorney Kwee's email, providing a lengthy explanation of the remote advisement process and informing Kwee that expecting Plaintiff to monitor an inactive Zoom link, already maintained and monitored by the departmental secretary, was unproductive and entirely dubious.

361.     Despite the explanation provided to Attorney Kwee on September 27, 2022, by email dated November 18, 2022, Kwee advanced the false claim that Plaintiff was "unavailable for your remote advising assignment this school year as you have not logged into zoom […]".

362.     Plaintiff's subjective reaction to having been contacted twice by Attorney Kwee was that, instead of Defendant Chair DeSpagna directly engaging Plaintiff about the use of the Zoom link (which Plaintiff openly encouraged, referring to ¶ 354), he instead went to Defendant Haugen, who in turn engaged Kwee to advance their ongoing harassment of Plaintiff.

363.    Plaintiff alleges that Defendant Chair DeSpagna's actions, with respect to this incident, are entirely dubious in nature and motivated by a deep-seeded retaliatory animus directed at Plaintiff, further aided and abetted by Defendant Officer Haugen.

364.    Plaintiff alleges that this incident is yet another example of retaliatory motive and the pervasively abusive and hostile work environment, which Plaintiff has endured for nearly three (3) years since the start of his full-time employment on January 21, 2020 (referring to ¶ 60).

365.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 80-82, as to Defendant Chair DeSpagna, with the same force and effect as if set forth within this incident.

366.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 100-102 and 304-307, with the same force and effect as if set forth within this incident.

## AS AND FOR CAUSES OF ACTION ONE AND TWO
### (All Defendants - Retaliation and Retaliatory Hostile Work Environment in Violation of 42 U.S.C. § 1981 - Civil Rights on Race)

367.    These causes of action are brought under this statute to vindicate Plaintiff's deprivation of secured Federal rights.

368.    Plaintiff has separately identified the participation and violations of each the Defendants within the twelve (12) discrete acts of retaliation, alleged herein.

369.    Plaintiff repeats and realleges each and every allegation made in the foregoing paragraphs with the same force and effect as if set forth herein.

370.    Plaintiff reiterates, that at all times relevant hereto, Defendants, and each of them, were acting under color of state law.

371.    Plaintiff engaged in a host of statutorily protected activities (including filing suit), alleging discrimination based on race after obtaining an EEOC Determination of Reasonable Cause.

372.    Plaintiff realleges that the individually named Defendants, and each of them, were aware of the nature and extent Plaintiff's protected activities (referring to ¶¶ 27-43 and 53-59).

373.    After engaging in such protected activities, within the immediate temporal proximity of the settlement the lawsuit, Defendant NCC (and the individually named Defendants), engaged in a campaign of retaliation against Plaintiff, including twelve (12) discrete acts of retaliation, alleged herein.

374.    Defendants' retaliatory animus against Plaintiff was continuous, concerted, abusive, extreme and outrageous.

375.    Each of the twelve (12) discrete acts of retaliation are alleged to constitute material adverse employment actions suffered by Plaintiff.

376.    Collectively, the twelve (12) discrete acts contributed to a pervasively retaliatory hostile work environment, sufficiently severe to alter the conditions of Plaintiff's employment and create a pervasively abusive working environment.

377.    As to the twelve (12) discrete acts of retaliation, Plaintiff alleges (from his subjective reactions throughout this Complaint), that a reasonable person would have found the employment environment at Defendant NCC to be pervasively hostile and abusive.

378.    Plaintiff alleges that there was an institutional failure by Defendant NCC to properly train its employees as to the prevention of retaliation, amounting to a deliberate indifference against those who pursue statutorily protected activities opposing discrimination.

379.    To the extent alleged herein, each of the individually named Defendants: (a) participated in violations of Federal law, thereby denying Plaintiff's equal rights and protection under the U.S. Constitution; and/or (b) after being informed of same, failed to take prompt and efficacious action to prohibit or discourage such conduct, thereby accepting and ratifying the violations; and/or (c) created a policy or custom under which unconstitutional practices occurred

or allowed them to continue; and/or (d) were grossly negligent in supervising subordinates who committed the wrongful acts; and/or (e) exhibited deliberate indifference by failing to act on information indicating that such violations were occurring.

380.    The allegations herein demonstrate that "but for" Plaintiff engaging in a host of protected activities, he would not have suffered the numerous materially adverse employment effects caused by Defendants' retaliatory animus.

381.    As a result of Defendants' retaliatory animus, Plaintiff has suffered and will continue to suffer irreparable injury, economic damages, along with damages for mental anguish and emotional distress.

382.    By engaging in the foregoing illegal conduct, Defendants acted with malice and reckless disregard for Plaintiff's civil rights under 42 U.S.C. § 1981.

383.    Plaintiff's § 1981 causes of action are proper per Second Circuit precedent. _Littlejohn_ v. _City of New York_, 795 F.3d 297, 313-15 (2d Cir. 2015) - (reiterating criteria for municipal and individual capacity claims under §§ 1981 and 1983, and finding disparate treatment and retaliation claims actionable against city municipal supervisor in individual capacity).

## AS AND FOR CAUSES OF ACTION THREE AND FOUR
### (All Defendants - Retaliation and Retaliatory Hostile Work Environment in Violation of 42 U.S.C. § 1983 - Equal Protection Claims)

384.    Plaintiff repeats and realleges each and every allegation made in the foregoing paragraphs with the same force and effect as if set forth within.

385.    Plaintiff repeats and realleges ¶¶ 367-370 and 372-381, with respect to Causes of Action Three and Four.

386.    Plaintiff engaged in a host of statutorily protected activities (including filing suit), alleging discrimination based on age, race and gender, after obtaining an EEOC Determination of Reasonable Cause.

387.    By engaging in the foregoing illegal conduct, Defendants acted with malice and reckless disregard for Plaintiff's equal protection rights under 42 U.S.C. § 1983.

388.    Plaintiff's § 1983 causes of action are proper per Second Circuit precedent. *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 80-82 (2d Cir. 2015) - (outlining the viability of retaliation claims under § 1983).

**AS AND FOR CAUSE OF ACTION FIVE**
**(All Defendants - <u>Retaliation</u> and <u>Retaliatory Hostile Work Environment</u>**
**in Violation of NYHRL)**

389.    Plaintiff repeats and realleges each and every allegation made in the foregoing paragraphs with the same force and effect as if set forth herein.

390.    Defendants retaliated against Plaintiff (including creating a retaliatory hostile work environment), in the manner enumerated above in CAUSES OF ACTION ONE through FOUR.

391.    Defendants failed to maintain and enforce a policy prohibiting retaliation and similar misconduct in the workplace, also failing to provide any effective method by which such misconduct could be addressed and remedied, and by such action and inaction, authorized and ratified such illegal conduct toward Plaintiff in violation of NYHRL.

392.    As a result of Defendants' retaliatory animus, Plaintiff has suffered and will continue to suffer irreparable injury, economic damages, along with damages for mental anguish and emotional distress.

393.    By engaging in the foregoing illegal conduct, Defendants acted with malice and reckless disregard for Plaintiff's rights under NYHRL.

394.    Plaintiff alleges that each of the individually named Defendants retains liability under NYHRL §§ 296(1) and (7) since they retain the power to control the workplace by virtue of their respective authority (beyond carrying out personnel decisions by others), including, but

not limited to, the power to: (a) hire and fire personnel; (b) control work schedules; (c) determine the rate and payment of compensation; (d) maintain employment records and (e) control the overall conditions of employment.

395.    This Court may assume supplemental and pendant jurisdiction of these causes of actions (referring to ¶¶ 5-7).

**AS AND FOR CAUSE OF ACTION SIX**
**(Individual Defendants - Aiding, Abetting, Inciting, Coercing and**
**Compelling Retaliation in Violation of NYHRL)**

396.    Plaintiff repeats and realleges each and every allegation made in the foregoing paragraphs with the same force and effect as if set forth herein.

397.    The individual Defendants directly participated in the retaliation against Plaintiff (including creating a retaliatory hostile work environment), in the manner enumerated above in CAUSES OF ACTION ONE through FOUR, thereby aiding, abetting, inciting, coercing and compelling illegal retaliation in violation of New York Executive Law §§ 296 (6) and (7).

398.    The individual Defendants acted willfully and wantonly in their persistent retaliation against Plaintiff, thereby aiding, abetting, inciting and coercing illegal retaliation.

399.    By reason of the individual Defendants' aiding, abetting, inciting, coercing and compelling illegal retaliation, Plaintiff has suffered and will continue to suffer irreparable injury, economic damages, along with damages for mental anguish and emotional distress.

400.    This Court may assume supplemental and pendant jurisdiction of this cause of action (referring to ¶¶ 5-7).

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests and prays that the Court enter a judgment:

a.        Declaring that the acts and practices complained of herein are in violation of the U.S. Constitution, New York State Constitution and applicable statutes (both Federal and state), common law and principles of equity, cited herein;

56

b.      declaring that the hereinabove violations by Defendants, their employees, representatives and agents are willful;

c.      ordering Defendants to take such affirmative action as is necessary to ensure the effects of these violations are eliminated and do not continue to affect Plaintiff's employment, as well as those similarly situated;

d.      enjoining and permanently restraining Defendants, and each of them, from any acts or violations based on the events complained of herein;

e.      ordering Defendants to pay Plaintiff compensatory damages for his economic loss, mental anguish, emotional stress and inconvenience, in an amount to be determined at trial;

f.      ordering Defendants to pay Plaintiff punitive damages (where applicable) for their willful, outrageous, extreme, intentional, malicious and reckless conduct described hereinabove, in an amount to be determined at trial;

g.      ordering Defendants to pay any other applicable damages permitted by law;

h.      awarding Plaintiff the costs of bringing and maintaining this action, together with reasonable attorneys' fees (pursuant to 42 U.S.C. § 1988), if such representation is subsequently obtained in pursuing this action; and

i.      ordering Defendants to provide training to those employees (administration and supervisory) as to the protections afforded those individuals pursuing protected activities to redress illegal discrimination under the applicable Federal and State statutes.

## **DEMAND FOR A TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a **Trial By Jury** in this action.

## PLAINTIFF'S CERTIFICATION

I hereby certify to the best of my knowledge, information, and belief that: (1) the

Complaint is not being presented for improper purpose; (2) the claims are supported by existing

law; (3) the factual contentions have evidentiary support or will likely have evidentiary support

after a reasonable opportunity for further investigation or discovery; and (4) the Complaint

otherwise complies with the requirements set forth in Federal Rule of Civil Procedure 11.

Dated: Old Bethpage, New York
      November 21, 2022

By: *Dominick J. Siani*
    Dominick J. Siani, *pro se*
    11 Walter Lane
    Old Bethpage, New York 11804
    Tel. No.: (631) 265-4153
    Email: dsiani@msn.com

JS 44 (Rev. 01/29/2018)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| DOMINICK J. SIANI, pro se | NASSAU COMMUNITY COLLEGE, et al. |

| (b) County of Residence of First Listed Plaintiff    NASSAU | County of Residence of First Listed Defendant    NASSAU |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Dominick J. Siani<br>11 Walter Lane, Old Bethpage, NY 11804-1534; Tel. (631) 265-4153 | Thomas A. Adams, Nassau County Attorney<br>Ingerman Smith, L.L.P. , David Kwee, Esq., of Counsel |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
42 U.S.C. Sections 1981, 1983; and pendant state law claims under NY Exec. L. 290-297.

Brief description of cause:
Retalition and Retaliatory Hostile Work Environment Claims under the stated Federal and NY statutes.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE    District Judge Roslynn R. Mauskoph    DOCKET NUMBER    18-CV-3308 (RRM) (SIL)

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 11/21/2022 | *Dominick J. Siani* |

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.10 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

I, __Dominick J. Siani, pro se_____, counsel for_____, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

- ☑ monetary damages sought are in excess of $150,000, exclusive of interest and costs,

- ☑ the complaint seeks injunctive relief,

- ☐ the matter is otherwise ineligible for the following reason

### DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

### RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

### NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.) Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County?    ☐ Yes    ☑ No

2.) If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County?    ☐ Yes    ☐ No

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District?    ☑ Yes    ☐ No

c) If this is a Fair Debt Collection Practice Act case, specify the County in which the offending communication was received:                    .

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?_____ ☐ Yes_____ ☐ No
*(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).*

### BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

☐    Yes                    ☐    No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

☐    Yes    (If yes, please explain)    ☐    No

I certify the accuracy of all information provided above.

**Signature:** _Dominick J. Siani_____